1

2

3

4

5

6

7

8

9

10

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

11

12

13

14

15

16

| | |
|---|---|
| RODNEY GUPTON,<br><br>            Petitioner,<br><br>      v.<br><br>C. K. PLILER, Warden,<br><br>            Respondent. | 1:04-CV-5480 LJO HC<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS<br><br>ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT FOR RESPONDENT |

17

18

19

20

21

22

23

      Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is represented in this action by James Koester, Esq. Due to the death of Magistrate Judge Hollis G. Best and the appointment of Magistrate Judge William M. Wunderlich, by order dated May 2, 2004, this case was reassigned to the undersigned for all further proceedings. The parties having voluntarily consented to exercise of Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1), by order dated August 4, 2004, this case was assigned to the undersigned for all purposes, including entry of final judgment.

24

## PROCEDURAL BACKGROUND[1]

25

26

      Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction by jury

27

28

---

[1]This information is derived from the petition for writ of habeas corpus, Respondent's answer to the petition, and the exhibits submitted in support of Respondent's answer.

1  trial on June 20, 2001, of assault with a firearm (Cal. Penal Code § 245(a)(2)), and shooting at an

2  occupied motor vehicle (Cal. Penal Code § 246). See Exhibit 1, Respondent's Answer to the Petition

3  (hereinafter "Answer"). Petitioner was sentenced to serve an indeterminate term of fifteen years to

4  life in state prison. Id.

5  Thereafter, Petitioner filed a notice of appeal with the California Court of Appeal, Fifth

6  Appellate District (hereinafter "5th DCA"). On January 29, 2003, the 5th DCA issued an unpublished

7  opinion affirming the judgment. See Exhibit 3, Answer. The 5th DCA issued a Modification of

8  Opinion on February 11, 2003, which did not affect the judgment. See Exhibit 4, Answer.

9  Petitioner filed a petition for review in the California Supreme Court on March 4, 2003. See

10  Exhibit 5, Answer. Petitioner's co-defendant filed a petition for review on the same date in the same

11  case. See Exhibit 6, Answer. On March 6, 2003, counsel for Petitioner filed a Joinder in Petition for

12  Review. See Exhibit 7, Answer. On April 9, 2003, the petition was summarily denied. See Exhibit 8,

13  Answer.

14  On March 24, 2004, Petitioner filed the instant federal habeas petition in this Court.

15  Petitioner raises three grounds for relief: 1) Petitioner claims there was insufficient evidence of

16  specific gang intent in violation of his Fourteenth Amendment right to due process; 2) Petitioner

17  claims the jury instruction, CALJIC No. 17.41.1, violated his right to an independent unbiased jury

18  under the Sixth Amendment; and 3) Petitioner claims the trial court excluded evidence of third party

19  culpability in violation of his Fourteenth Amendment due process rights.

20  On July 1, 2004, Respondent filed an answer to the petition. Respondent concedes that

21  Petitioner has exhausted his state remedies.

22  On August 2, 2004, Petitioner filed a traverse.

**FACTUAL BACKGROUND**

24  **Prosecution**

25  On March 23, 2001, Saunikka Ford was at the Bombay Club in downtown Bakersfield. (RT

26  1416.) She had borrowed co-defendant Jaime Avila's green Ford Taurus. (RT 1417.) She had parked

27  the vehicle down the street from the club. (RT 1422.) Upon driving the vehicle home, Ford

28  discovered that the vehicle had been shot at. (RT 1422.) She reported her discovery to the police

1    when she returned home. (RT 1422.) Avila, aka Pete, picked up the vehicle the next day. (RT 1423.)

2    On March 24, 2001, Janette Martin and Shannon Parker were driving on Lakeview Avenue in

3    Bakersfield when they were hailed by Avila and Petitioner. (RT 790-793.) Martin and Parker turned

4    their vehicle around and stopped to talk to Avila and Petitioner. (RT 793.) Avila and Petitioner got

5    into Martin and Parker's car; Avila asked Parker to drive them to an auto body repair shop so Avila

6    could check on his car which was in the shop. (RT 794-795.) After Avila spoke to someone at the

7    shop, he got back into Parker's vehicle and asked the women if they would rent him a car. (RT 796.)

8    Martin agreed, so they went to Budget Rental Car where she rented Avila a gold Toyota Solara. (RT

9    797-799.) Martin and Avila then drove the Toyota to a liquor store; Parker and Petitioner followed in

10   the other vehicle. (RT 800-801.) Martin told Avila that the car had to be returned to the rental facility

11   by 10:00 a.m. on Monday, March 26. (RT 802.) Martin gave the keys to the Toyota to Avila who

12   then drove away. (RT 801.) Petitioner was in the passenger seat. (RT 801.)

13   Shaquita Ballard testified that she hosted a barbeque at her residence located at 4132 Parker

14   Avenue in Bakersfield on Sunday, March 25. (RT 1088, 1093.) She testified that Avila had attended

15   the barbeque. (RT 1094.) She had known Avila for approximately three to four years. (RT 1095.)

16   She further testified that she had known Petitioner for approximately five years and that he was also

17   present at the barbeque. (RT 1097-1098.) She testified that she did not remember telling police that

18   she had seen Petitioner and Avila arrive around 2:00 p.m. (RT 1099.) She also stated she did not

19   remember telling police that Petitioner and Avila left at around 5:00 p.m. (RT 1100.) She recognized

20   a tan-colored Toyota Solara from a photograph as resembling a vehicle that was at the barbeque. (RT

21   1100.) She testified that she did not remember telling police that Petitioner and Avila left in the tan

22   Solara at 5:00 p.m. and then returned to her house at 6:00 to 6:30 p.m. that evening. (RT 1100-1101.)

23   Kieisha Steverson had been dating Lonnie Delaney for approximately three-and-a-half years

24   and had known him for approximately five years. (RT 822.) On March 25, 2001, Delaney visited

25   Steverson at her residence in Bakersfield. (RT 824.) After they returned to Steverson's residence

26   following dinner, Delaney drove away in his red Dodge Intrepid. (RT 824-827.) Steverson then saw

27   a Toyota Solara give chase to Delaney's vehicle. (RT 828.) Steverson testified that she had seen

28   Petitioner with about four other people in the Toyota Solara at 10:00 p.m. on the day before outside

1   the Hurricane Club in Bakersfield. (RT 833-834.) She recognized Petitioner as they had attended

2   junior high school together. (RT 835.) When she saw Petitioner in the Toyota Solara the next day,

3   she grew concerned because she knew Petitioner and Delaney did not get along. (RT 835-836.)

4   Steverson testified that Petitioner was the front passenger of the Solara. (RT 838.) Steverson

5   witnessed the Solara chasing and attempting to catch up with Delaney's vehicle. (RT 838-839.) She

6   then watched Petitioner extend his hand out from the front window of the Solara, aim a gun at

7   Delaney's vehicle, and fire five shots. (RT 839-840.) Delaney's vehicle then crashed into a house.

8   (RT 840.) Steverson ran to Delaney's vehicle to see if he was hurt, and the Solara drove away. (RT

9   840.) When Steverson ran up to the vehicle, Delaney was crawling out of the driver's side window.

10  (RT 841-842.) Approximately seven to ten minutes later, the police arrived on scene. (RT 842.) She

11  was not able to identify the driver of the Solara. (RT 848.)

12          Lonnie Delaney stated that he was not a member of the Westside Crips. (RT 909.) He also

13  denied that Kieisha Steverson was his girlfriend. (RT 909.) Delaney admitted he was driving a red

14  Intrepid on the day in question. (RT 910.) He stated a sports car chased him and he saw a "little

15  black thing" come out of the window. (RT 916.) He then accelerated his vehicle and lost control

16  around a corner. (RT 914-916.) He testified that he crashed his car into a residence and cut his lip.

17  (RT 911.) He stated he did not hear any gun shots because his music was turned up. (RT 917.)

18          Victor Carter, a retired Army soldier, lived on T Street near the location of the incident. (RT

19  1041-1043.) He testified that he was standing in his yard outside his residence when he heard two

20  gunshots and a ricochet. (RT 1042-1043.) When he looked down the street to see where the shots

21  were coming from, he saw two cars speeding down the street. (RT 1043.) He watched as a burgundy-

22  colored car approached first followed by a lighter tan or gold-colored car. (RT 1044.) The light-

23  colored car was attempting to catch up to the other vehicle. (RT 1044.) As they neared, Carter saw a

24  man hanging out of the passenger window pointing an automatic weapon at the other vehicle. (RT

25  1044-1045.) He watched as the man fired approximately six to eight shots at the driver of the other

26  vehicle. (RT 1045.) He ducked because he was in the line of fire. (RT 1048.) When he looked up, the

27  red-colored vehicle had crashed into a house and the gold-colored vehicle drove off. (RT 1049.) He

28  then dialed 911 and reported the incident. (RT 1049.) He then went to the crashed vehicle and

1   checked on the occupant. (RT 1050.)

2         Carter stated he had seen the red-colored vehicle parked down the street earlier in the day.

3   (RT 1045.) He stated he had seen the driver speak to a female for approximately 5 to 10 minutes.

4   (RT 1045.) The man then got into his vehicle, turned up the music, and drove away. (RT 1045.)

5         Carter made an in-court identification of Avila as the driver of the light-colored vehicle. (RT

6   1053.) He also identified Petitioner as the passenger who had leaned out of the vehicle and shot at

7   the driver of the other vehicle. (RT 1053.) A photographic lineup was conducted on the same day as

8   the incident; however, Carter was only able to identify Avila at that time and could not identify the

9   shooter. (RT 1055.) Carter was able to identify Petitioner nine days later after he had seen a picture

10   of him in a newspaper. (RT 1055, 1069.) He had not read the article yet, but immediately identified

11   Petitioner as the shooter from his photograph in the paper. (RT 1055.) During cross-examination,

12   Carter acknowledged that he had initially told police that the shooter had long hair; however, he

13   stated he was mistaken because it was the driver who had the long hair. (RT 1063.)

14         Sergeant Don Martin and Officer Claudia Payne of the Bakersfield Police Department

15   responded to the location of the incident on March 25 at 5:50 p.m. (RT 932-933.) Sergeant Martin

16   made contact with Delaney and inquired as to his injuries. (RT 935.) Delaney refused to be taken to

17   the hospital. (RT 935.) Upon speaking with Delaney, Sergeant Martin found him to be less than

18   forthcoming in his responses. (RT 935.) Martin also spoke with Steverson. (RT 935.) Steverson told

19   Martin that she was concerned for her safety in speaking with him, so Martin took her inside the

20   residence to speak with her. (RT 935-936.) Once inside, Steverson told Martin that she was standing

21   in her front yard when she saw Petitioner shoot at Delaney while "hanging out the passenger

22   window." (RT 936-937, 939.) Steverson stated that she knew Petitioner by the moniker of "Lou" and

23   that he was an active member of the Eastside Crips gang. (RT 939.)

24         Officer Payne testified she conducted a search of Delaney's vehicle. (RT 944-945.) Among

25   other things, Payne discovered a blue baseball bat, a blue hat, and a blue bandanna. (RT 945.) The

26   blue hat had the word "Westside" written across the top with a number "6" in the middle; the initials

27   "H-O-G-S" were located at the bottom of the hat. (RT 953.) She also discovered three spent bullets

28   inside the car. (RT 945.) One was located on the driver's side rear door, another was located in the

1  trunk deck, and a third was located inside the car, in the space between the front seat and front

2  passenger's door. (RT 945.) Payne contacted Steverson on March 26. (RT 961.) Steverson identified

3  Petitioner as the shooter, but she was not able to identify the driver. (RT 961-962.)

4      Officer Kenneth Grove of the Bakersfield Police Department testified that he conducted a

5  search of Saunikka Ford's residence on March 25 to March 26. (RT 978-979.) Among the items

6  Grove seized from the residence was a photograph of Petitioner standing next to a tree displaying a

7  hand-sign of the Eastside Crips gang. (RT 979.) Grove also seized a second photograph which

8  depicted Petitioner displaying a hand-sign, sideways, of the Westside Crips with one hand and his

9  other hand in the form of a gun pointed at the hand-sign. (RT 979.) This display indicated disrespect

10  toward the Westside Crips gang. (RT 979.)

11     Bakersfield Police Officer Stephen Wilson responded to the scene and was assigned to make

12  contact with Delaney. (RT 1136-1137.) Officer Wilson was a member of the gang unit of the police

13  department and knew Delaney through prior contacts. (RT 1137.) Wilson observed that Delaney had

14  various injuries such as glass in his face and hair, a bloody lip, a hole through the bottom lip, and

15  several lacerations to his elbows and arms. (RT 1137.) Delaney refused further medical treatment.

16  (RT 1138.) When asked what had occurred, Delaney informed Officer Wilson that he was pursued

17  by the gold-colored vehicle. (RT 1139.) Delaney stated that he saw the car overtake him and a man

18  reach out of the window and begin shooting at him. (RT 1139.) Delaney attempted to duck to avoid

19  getting shot, lost control of his vehicle, and crashed into the house. (RT 1139.)

20     Shannon Parker had been friends with Petitioner for approximately 12 years and friends with

21  Avila for approximately 2 years. (RT 869-870.)  On March 24, she and her friend Janette Martin met

22  up with Petitioner and Avila. (RT 872.) She recalled that they went together to an auto body shop

23  and then to Budget Rental Car. (RT 873, 875.) They then rented a car from Budget. (RT 877.) They

24  left together and traveled to Vernon Strong's store where Petitioner and Avila left in the rental car.

25  (RT 877.) On March 25, at approximately 5:30 to 7:00, Avila called Parker to notify her where to

26  pick up the rental vehicle. (RT 880.) Parker stated that Avila informed her the vehicle was near

27  Acres and Parker in Bakersfield. (RT 880.) Parker and her friend then left and picked up the vehicle.

28  (RT 881.) They arrived at the apartment complex on Parker and located the vehicle in an alley. (RT

883.) She saw Avila exiting from the driver's side of the vehicle. (RT 883.) Avila gave Parker the keys and she drove off. (RT 883.) Parker called Martin and asked her whether she had seen the news that Petitioner and Avila had been arrested. (RT 887.) Parker then went to Martin's house and picked her up. (RT 888.) They attempted to return the rental car to Budget, but Budget refused to accept the vehicle until they provided a statement to the Sheriff's Office. (RT 888.) They then went to the police station and provided statements that Petitioner and Avila had been the two individuals who had used the rental car. (RT 889-890.)

Officer Clayton Madden, a member of the Special Enforcement Unit of the Bakersfield Police Department and tasked with gang enforcement and gang-related crimes, was assigned to follow up on the shooting incident that occurred at the Bombay Club by investigating Tito's Body Shop. (RT 853-855.) Officer Madden located a green Ford Taurus at the shop which matched the description of the vehicle that was reported as having been shot at in front of the Bombay Club. (RT 855.) Officer Madden stated the vehicle had a bullet hole through the right rear window as well as what appeared to be a bullet strike in the right rear door. (RT 856.) While Officer Madden was impounding the vehicle, he was approached by co-defendant Avila. (RT 859.) Avila told Madden that he had received information from a female that Westside Crips gang members were responsible for the shooting of his vehicle. (RT 861.) Avila stated he believed certain members were responsible, specifically: Michael Delaney, aka "Slingshot," Demark Delaney, aka "D.R.," Lonnie Delaney, aka "Squeak," and Rufus Brown, aka "Little Shelton" and "Baby." (RT 861-862.) Demark Delaney and Michael Delaney were brothers of Lonnie Delaney. (RT 862.) Avila informed Officer Madden that he believed these individuals had shot at the vehicle believing he had been occupying it. (RT 863.) Avila stated that the Westside Crips knew he drove that vehicle. (RT 863.) He further stated he was aware that Lonnie Delaney and Rufus Brown were shooting at Eastside Crips. (RT 863.)

Bakersfield Police Officer Gary Carruesco assisted in the investigation of the shooting incident at Eleventh and T Street on March 25. (RT 1141-1142.) He responded to an apartment at Parker Avenue and made contact with Shaquita Ballard. (RT 1142-1143.) Ballard told Officer Carruesco that she knew Petitioner and Avila. (RT 1143-1144.) She informed Carruesco that Petitioner and Avila had arrived at her barbeque at approximately 2:00 p.m. in a tan Toyota Solara.

(RT 1144-1145.) She said they left around 5:00 p.m. and then returned at approximately 6:00 to 6:30 p.m. (RT 1145.) She stated they left again at around 7:00 p.m. and left the Solara in an alley behind the apartment. (RT 1145-1146.)

Officer Carruesco was also present during co-defendant Avila's booking process. (RT 1197.) Avila claimed membership in the Eastside Crips gang and requested to be kept away from Blood gang members. (RT 1198.) Officer Carruesco noted Avila had tattoos of an "S" and a "G" on the back sides of his arms which signified "Spoonie G," a subset of the Eastside Crips criminal street gang. (RT 1198.)

Bakersfield Police Officer Joe Dougherty testified regarding a traffic stop in 1999 involving Petitioner. (RT 1202.) During the traffic stop, Officer Dougherty seized a blue baseball hat that had the letters "WSK" and "CBK" embroidered on it. (RT 1203.) Dougherty asked him whether he belonged to a gang and Petitioner responded that he had been a member of the Mid-City gang since the sixth grade. (RT 1204.) Dougherty asked if the initials "CBK" stood for "Country Boy Killer" and Petitioner said they did. (RT 1205.) He asked if the initials "WSK" stood for "Westside Killer" and Petitioner said they did. (RT 1205.) The color of the hat was also significant with blue being associated with the Crips gang. (RT 1206.)

Rebecca Stokes worked as a crime lab technician at the Bakersfield Police Department. (RT 1208.) She matched a fingerprint on the driver's side rearview mirror to Avila's right middle finger. (RT 1212.) She also matched a palm print on the passenger door to Avila's right palm. (RT 1212.) She did not conduct a gunpowder test to determine whether there was gunpowder residue in the car. (RT 1218.)

Officer Frank Gonzales of the Bakersfield Police Department conducted an investigation of Tierre Hester's residence in 1999. (RT 1227-1228.) During the search, two videotapes were seized. (RT 1228.) The videotapes were titled, "Kicking back at Mattie's house with E Niggas." (RT 1228.) The videotapes contained footage showing gang affiliation. (RT 1229.) Petitioner was seen on the video demonstrating gang signs of the Eastside Crips. (RT 1231, 1285.) Hester was seen on the video with his left hand forming a "W" for the Westside Crips and his right hand forming a gun pointed at the "W" demonstrating disrespect or an intent to shoot at that particular group. (RT 1287.)

At one point, a female flashed signs of the rival Westside Crips and Petitioner immediately reacted by grabbing her. (RT 1326.) Petitioner made a comment that if the police ever viewed the videotape, they would have to "gang bang on the police." (RT 1334.)

Officer Martin Heredia, a member of the Special Enforcement Unit, also known as the gang unit, testified as a gang expert. (RT 1234.) The Westside Crips and Eastside Crips are criminal street gangs in Bakersfield that commit, as one of their primary activities, a number of offenses including serious or violent felonies. (RT 1241-1242.) The two gangs are rivals; they commit assaults, shootings, and murders against each other. (RT 1242-1243.) In Heredia's opinion as a gang expert, Lonnie Delaney was a Westside Crips criminal street gang member. (RT 1245.) His opinion was based on a number of contacts with Delaney dating back to 1995. (RT 1245.) He stated that Delaney was still an active member and considered an "OG" which signifies that a gang member has been involved in the gang for a substantial amount of time and has participated in criminal activity and promoted the gang. (RT 1246-1247.) If a member of a rival gang kills an "OG" from another gang, it brings a great deal of respect to that individual and admiration from fellow gang members. (RT 1247-1248.) According to Heredia, Delaney had been active in acting against the Eastside Crips. (RT 1248.)

The Eastside Crips have various subsets including the Project Crips, Mid-City Crips, Stroller Boy Crips, Clifton Street Mobster, and Spoonie G Crips. (RT 1248.) Despite the various subsets, they all still owe their loyalty to the Eastside Crips as a whole. (RT 1249.) Officer Heredia was familiar with Petitioner from numerous contacts and knew him by his moniker of "Lou." (RT 1250.) In his expert opinion, Petitioner was an active member of the Eastside Crips. (RT 1250.) His opinion was based on numerous contacts Petitioner had with various officers from the gang unit. (RT 1250-1251.) In those reports, either gang paraphernalia was seized from Petitioner, Petitioner admitted his membership in the Eastside Crips, or he was in contact with a known member. (RT 1251.) Officer Heredia personally arrested him on one occasion, and Petitioner admitted his affiliation. (RT 1251.) He also had casual contact with Petitioner where Petitioner admitted his affiliation. (RT 1251.) Petitioner had tattoos signifying his gang affiliation: on his right forearm were the letters "E" and "S" signifying "Eastside" and on the back of each of his biceps was the number "1" signifying

"Eleventh Street" which is also known as "Project Crips." (RT 1251.) According to Heredia, only members of the gang would have such tattoos; otherwise, the individual would expose himself to serious harm. (RT 1252.) Eastside Crips gang members also wear blue hats or belt buckles with the letters "E" and "S." (RT 1252.) Wearing the letters "CBK" refers to "Country Boy Killer" and means that you are out to harm members of the Country Boy Crips. (RT 1253.) Wearing the letters "WSK" refers to "Westside Killer" and means that you are out to harm members of the Westside Crips. (RT 1253.) Officer Heredia was shown a photograph of Petitioner showing a sign for the Eastside Crips. (RT 1288.) In his opinion, Petitioner did so because he is a member of the Eastside Crips. (RT 1288.) He was also shown a photograph of Petitioner showing a "W" sign with his left hand and the form of a gun with his right hand pointed at the "W." (RT 1288.) In Heredia's expert opinion, this demonstrated disrespect by Petitioner of the Westside Crips or the Watson Boys subset of the Country Boy Crips or an intent to shoot at those gangs. (RT 1288.)

Heredia testified he believed co-defendant Avila was an active member of the Eastside Crips and an "OG." (RT 1289, 1293-1294.) His opinion was based on numerous contacts he had with Avila as well as reports from other officers. (RT 1289-1290.) Heredia also noted that Avila had the letter "S" on the rear of his left bicep and the letter "G" on the rear of his right bicep, which signified membership in the "Spoonie G" subset of the Eastside Crips. (RT 1290.) Heredia was shown a photograph in which Avila was displaying the letters "E" and "C" which demonstrated affiliation with the Eastside Crips. (RT 1292.)

In Heredia's opinion, the shooting committed by Petitioner and Avila against Delaney was in retaliation for the shooting of Avila's car. (RT 1294.) Heredia discussed the current trend of gang members' criminal activities. (RT 1297.) He stated it had become common for gang members to have an uninvolved individual, sometimes a drug user, rent a car for them which they would in turn use to commit crimes. (RT 1297.) Heredia also noted that witnesses to these crimes often fear retaliation and will be reluctant to testify or will request that interviews be conducted at locations away from the scene. (1298-1299.) Heredia testified that gang members will retaliate to disrespect or harm directed at them with the same level of violence or even greater. (RT 1300.) Something such as shooting at a respected "OG" gang member's car, such as Avila's, would not go unpunished or

1  unmet by equal or greater power. (RT 1300.) It is inherent that the victim would retaliate or the

2  victim would demonstrate weakness in the face of his gang and rival gang members. (RT 1301.) In

3  addition, if one gang member is attacked or insulted, all other gang members take it personally as an

4  offense committed against the gang itself. (RT 1321.) In Heredia's opinion, if two gang members

5  were acting in concert to commit a crime, it is strong evidence that they are acting in furtherance of a

6  criminal street gang. (RT 1331.) It was Heredia's expert opinion that Petitioner and Avila committed

7  the shooting against Delaney in furtherance or the criminal street gang of the Eastside Crips. (RT

8  1301.) Heredia also opined that the motivation was also personal. (RT 1302.) Heredia testified that

9  the personal element of the retaliation did not alter his opinion that the retaliation was also in

10  furtherance of the criminal street gang. (RT 1302.)

11  On Monday, March 26, Parker took Martin over to Parker's residence where Martin located

12  the rental car. (RT 804-807.) The car had been wrecked. (RT 807.) When Martin attempted to return

13  the car to Budget Rental Car, they refused to accept it because the Kern County Sheriff's Department

14  was looking for her. (RT 808.) Martin then went to the police station where she gave a statement.

15  (RT 809.)

16  The parties stipulated that the Eastside Crips and Westside Crips are criminal street gangs as

17  defined in Cal. Penal Code § 186.22(E) and (F). (RT 1350.) The definition was read to the jury. (RT

18  1350.) The parties further stipulated that Avila was contacted on March 25, 2001, and a photograph

19  was seized from his wallet. (RT 1351.) The parties stipulated that Avila was arrested on March 26,

20  2001. (RT 1351.)

21  **Defense**

22  Dr. Shanthi Keshava was a psychiatrist who worked full-time for L.A. County Mental Health

23  and one day a week for Kern County Mental Health. (RT 1258.) She had diagnosed Shaquita Ballard

24  with major depression and post-traumatic stress disorder. (RT 1259.) To aid in treatment, Dr.

25  Keshava prescribed Paxil, BuSpar, and Zyprexa. (RT 1262.) According to Dr. Keshava, someone

26  with Ballard's mental condition might not understand what was being asked of her. (RT 1263.) In

27  addition, she might become confused and could provide answers just to get out of the situation. (RT

28  1264.)

1    Maryann Bryant owned the apartment complex at Parker Avenue and rented one of the

2    apartments to Shaquita Ballard. (RT 1362.) She was contacted by police regarding the barbeque on

3    March 25, 2001. (RT 1363.) She told police she did not know Petitioner, but she knew Avila because

4    he was her daughter's boyfriend. (RT 1365.) Bryant testified that Avila left the barbeque with her

5    daughter, her three grandchildren, Yvette, and Yvette's daughter in a Cadillac at around 7:00 p.m.

6    (RT 1366, 1373.) Bryant testified that Avila had helped her move furniture at approximately 6:30

7    p.m. (RT 1374.) She testified she saw Avila in her backyard at approximately 5:30 to 5:40 p.m. (RT

8    1375.)

9    Tangela Bryant testified that she was at the barbeque on March 25, 2001. (RT 1381.) Avila

10   had driven her to the barbeque in a gray Cadillac at around 2:00 to 3:00 p.m. (RT 1381.) She stated

11   she ate with Avila at around 5:30 p.m, based on her estimation. (RT 1383.) She testified that Avila

12   was at the barbeque until around 8:00 to 9:00 p.m., when she left with him. (RT 1384.) She stated

13   she did not see him leave during that time. (RT 1384.) She stated Avila was at the apartment the

14   whole time and was playing with his daughter. (RT 1385.) She also acknowledged that she had

15   spoken to a female police officer and told her that she was inside during the barbeque and Avila was

16   outside. (RT 1386.)

17   Debra Bryant was at the barbeque on March 25, 2001, with Avila. (RT 1391.) Debra Bryant

18   stated she drove in her gray Cadillac, picked up Avila from his house, and arrived at the barbeque

19   some time in the early afternoon. (RT 1392-1393.) When they arrived, Avila began preparations for

20   the meal. (RT 1393.) They left later to pick up Monique. (RT 1393.) They returned around 3:00 p.m.

21   and Avila resumed cooking the meal. (RT 1394.) They then ate in the living room. (RT 1394.) After

22   they ate, Avila reclined on a mattress with his daughter, Shelatanay. (RT 1395.) At around 5:40 p.m.,

23   her mother, Maryann Bryant, returned from church. (RT 1396.) Avila was still inside the apartment.

24   (RT 1396.) A little after 8:00 p.m., Debra Bryant and Avila helped Maryann Bryant move furniture

25   in Maryann Bryant's residence. (RT 1397.) They then left in the gray Cadillac. (RT 1397.) Debra

26   Bryant testified that Avila was at the barbeque the entire time. (RT 1398.) She stated he never left

27   the barbeque until he left with her in the evening. (RT 1399-1400.) She testified that Petitioner was

28   at the barbeque as well. (RT 1400.) She also stated that other males were at the barbeque. (RT 1402.)

1    Saunikka Ford testified she left the barbeque with Petitioner on March 25, 2001, and stayed

2 with her at her apartment until he was arrested on March 26. (RT 1413.) She said that when

3 Petitioner was being arrested, he yelled, "If you guys think I did anything, test me for gun powder."

4 (RT 1415.) She stated Petitioner was her boyfriend and she had known him since high school. (RT

5 1416.) She denied that Petitioner was an Eastside Crip. (RT 1416.) On March 24, 2001, she was at

6 the Bombay Club with Avila's vehicle. (RT 1417.) She acknowledged that she told police that it was

7 possible Petitioner could have left the barbeque during the time that she was there. (RT 1420.) She

8 acknowledged that Petitioner had been a member of the Eastside Crips in the past, but not in the six

9 or seven months prior to the incident. (RT 1425, 1428.)

10    Grinnell Griffin, a defense investigator, went to the home of the parents of Kieisha Steverson.

11 (RT 1456.) Griffin videotaped the location, and the videotape was played for the jury. (RT 1460.)

12    Officer Kenneth Grove testified that he made contact with Petitioner's mother, Annette

13 Davis, at her residence on March 25, 2001. (RT 1468-1469.) He informed Davis that they were

14 looking for her son because he was a suspect in a shooting. (RT 1469.)

15    Annette Davis testified that she was contacted by Officer Grove on March 25, 2001. (RT

16 1471.) She stated that Officer Grove looked through her house and informed her that the police were

17 looking for Petitioner. (RT 1471.) Later, she spoke to Petitioner by phone and told him that the

18 police were looking for him because he was a suspect in a shooting. (RT 1472.)

19 **Prosecution's Rebuttal**

20    Officer Matthew Peery of the Bakersfield Police Department was assigned to the Special

21 Enforcement Unit. (RT 1516.) At the request of the prosecution, Officer Peery drove from the site of

22 the shooting incident on Eleventh and T Streets to Shaquita Ballard's apartment on Parker Avenue.

23 (RT 1516.) The trip took the officer nine minutes and forty-five seconds. (RT 1516.) The distance

24 traveled was 5.2 miles. (RT 1516.)

25    On March 25, 2001, Bakersfield Police Officer Robert Guyton was called to the investigation

26 of the shooting incident at Eleventh and T Streets. (RT 1519-1520.) Officer Guyton contacted

27 Shaquita Ballard at her apartment. (RT 1520.) He stated the contact was very low key; after knocking

28 on her door, Ballard answered and invited the officers inside. (RT 1520.) Guyton, a former

1   emergency medical technician, testified that Ballard did not demonstrate any unusual or bizarre

2   behavior, she did not appear visibly shaken, she was not crying, and she did not exhibit any hysteria.

3   (RT 1538-1539.) The officers obtained her permission to look around the apartment for suspects, she

4   agreed, and they found no one. (RT 1521.) Officers Carruesco and Guyton questioned Ballard about

5   Petitioner and Avila, and she informed them that they had arrived at the barbeque at 2:00 p.m. and

6   had left at around 5:00 p.m. (RT 1528.) She told them they left in a tan car. (RT 1528.) She stated

7   they returned again at around 6:00 to 6:30 p.m. in the tan car. (RT 1528.) She stated she believed

8   they left the tan car in the alleyway behind the apartment. (RT 1529.) While at her apartment, they

9   located a cell phone and seized it. (RT 1521.) When they seized it, Ballard informed them that one of

10  the suspects they were looking for had made a call to that cell phone. (RT 1522.) Officer Guyton

11  scrolled through the call history of the phone and found phone number "322-2442" which was the

12  phone number at the apartment of Saunikka Ford, Petitioner's girlfriend. (RT 1522-1523.) While

13  Guyton had custody of the cell phone, it rang and showed the number to that same apartment. (RT

14  1524.) Guyton and other police officers then went to Ford's apartment. (RT 1524-1525.) When they

15  arrived at the apartment, Guyton placed a call to that phone number and heard the phone ring inside

16  the apartment. (RT 1525.) The officers knocked on the door and received no response. (RT 1525.)

17  The officers then forced entry into the apartment. (RT 1526.)

18      Maryann Bryant told Officer Guyton that Avila had left with his daughter and Debra Bryant

19  in a gray Cadillac. (RT 1533.)

20      Gregory Laskowski was called as a ballistics expert. (RT 1542.) He stated that gun residue

21  testing is usually done within two to three hours of the shooting incident and before the suspect has

22  an opportunity to engage in physical activity or clean up. (RT 1545.) It is desirable for the suspect to

23  be in a controlled setting, for the suspect's hands to be bagged, and the suspect to be relatively

24  immobile. (RT 1546.) Certain factors such as wind would hamper collection of the gunshot residue

25  evidence. (RT 1546.) Laskowski was given a hypothetical of an individual firing a gun out of a fast-

26  moving vehicle while hanging out of the window and then not being contacted or arrested by police

27  for some seven hours later. (RT 1547.) Laskowski stated that in such a situation, the likelihood of

28  recovering any gunshot residue would be extremely remote, if not virtually impossible. (RT 1547.)

1    Currently, requests for such tests are referred to the Los Angeles County Coroner's Office. (RT

2    1544.)

3                                       **DISCUSSION**

4    **I.  Jurisdiction**

5         Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

6    to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

7    the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

8    375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S.

9    Constitution.  In addition, the conviction challenged arises out of the Kern County Superior Court,

10   which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 2241(d).  Accordingly,

11   the Court has jurisdiction over the action.

12        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

13   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

14   Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114

15   F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert.*

16   *denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997)

17   (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was

18   filed after the enactment of the AEDPA; thus, it is governed by its provisions.

19   **II.  Legal Standard of Review**

20        This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

21   pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

22   Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

23        The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

24   Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70

25   (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the

26   adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable

27   application of, clearly established Federal law, as determined by the Supreme Court of the United

28   States" or "resulted in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,

538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established

Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

quoting 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

of the relevant state-court decision." Id., quoting Williams, 592 U.S. at 412. "In other words, 'clearly

established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by

the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or

involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,

quoting 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the

writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

question of law or if the state court decides a case differently than [the] Court has on a set of

materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its

independent judgment that the relevant state court decision applied clearly established federal law

erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A

federal habeas court making the "unreasonable application" inquiry should ask whether the state

court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or

involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle,

94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th

1   Cir.1999).

2        AEDPA requires that we give considerable deference to state court decisions. The state

3   court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's

4   interpretation of its own laws. <u>Souch v. Schaivo</u>, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537

5   U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

6   **III.  Review of Petitioner's Claims**

7        **A.  Ground One**

8        Petitioner's conviction was enhanced pursuant to California Penal Code Section 186.22,

9   which applies to "any person who is convicted of a felony committed for the benefit of, at the

10  direction of, or in association with any criminal street gang, *with the specific intent to promote,*

11  *further, or assist in any criminal conduct by gang members*." (emphasis added.) In his first ground

12  for relief, Petitioner claims there was insufficient evidence of specific intent on his part to promote

13  or further the criminal conduct of the Eastside Crips, a criminal street gang. Petitioner argues the

14  only evidence of intent came from expert witness testimony. He argues the evidence shows instead

15  that Petitioner's motives were personal in nature, and not gang-related.

16       In reviewing sufficiency of evidence claims, California courts expressly follow the <u>Jackson</u>

17  standard enunciated in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979).  <u>See</u> <u>People v. Johnson</u>, 26 Cal.3d

18  557, 575-578 (1980); <u>see also</u> <u>People v. Thomas</u>, 2 Cal.4th 489, 513 (1992).  Pursuant to the

19  Supreme Court's holding in <u>Jackson</u>, the test in determining whether a factual finding is fairly

20  supported by the record is as follows:

21          "[W]hether, after viewing the evidence in the light most favorable to the
            prosecution, any rational trier of fact could have found the essential elements
22          of the crime beyond a reasonable doubt."

23  <u>Jackson</u>, 443 U.S. at 319; <u>see also</u> <u>Lewis v. Jeffers</u>, 497 U.S. 764, 781 (1990).

24       Sufficiency claims are judged by the elements defined by state law.  <u>Jackson</u>, 443 U.S. at 324

25  n. 16. This Court must presume the correctness of the state court's factual findings. 28 U.S.C.

26  § 2254(e)(1); <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 459 (1986).  This presumption of correctness

27  applies to state appellate determinations of fact as well as those of the state trial courts.  <u>Tinsley v.</u>

28  <u>Borg</u>, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to

1  state court determinations of legal questions or mixed questions of law and fact, the facts as found by

2  the state court underlying those determinations are entitled to the presumption.  Sumner v. Mata, 455

3  U.S. 539, 597 (1981).

4        In rejecting this claim, the 5th DCA found the evidence fully supported the jury's finding that

5  the crime was committed for the purpose of promoting the criminal conduct of the Eastside Crips.

6  The 5th DCA noted that this intent was likely not the sole intent of the parties and that Petitioner and

7  Avila may have had a personal motivation to seek retribution. Nevertheless, the 5th DCA noted that

8  § 186.22 did not require that the crime be committed exclusively for the benefit of a criminal street

9  gang.

10        The appellate court's conclusion was not unreasonable as there was substantial evidence of

11  Petitioner's specific intent to promote his gang, the Eastside Crips. The parties stipulated that the

12  Eastside Crips and Westside Crips were rival criminal street gangs in Bakersfield. Several police

13  officers testified that Petitioner and Avila were active members of the Eastside Crips with high status

14  in the gang, that of an "OG." Several photographs were seized from Petitioner's girlfriend's

15  apartment which showed Petitioner demonstrating gang signs representing the Eastside Crips.

16  Notably, one of the photographs showed Petitioner holding up the sign of a rival gang, the Westside

17  Crips, and then with his other hand forming the shape of a gun pointing at the rival's sign. The

18  evidence further showed that Lonnie Delaney was an active member of the rival gang, Westside

19  Crips.

20        Two days before the incident in question, Petitioner's girlfriend borrowed Avila's green Ford

21  Taurus. She drove the vehicle to the Bombay Club and went inside. During the time that she was

22  inside, the vehicle was shot multiple times. Avila took the vehicle to a body shop where he was

23  contacted by police. He informed the police that he had heard and suspected the shooting was

24  committed by the Delaney brothers who were members of the rival Westside Crips. Petitioner and

25  Avila then asked Petitioner's girlfriend to rent a car for them which they then used for the weekend.

26  Officer Heredia testified as an expert on criminal street gangs in Bakersfield and stated it was

27  common for gangmembers to rent vehicles to commit their crimes so as to make it more difficult for

28  the police to determine who committed the crime. The evidence showed that Petitioner and Avila

1  acted in concert. According to Officer Heredia, gang members customarily work together in

2  committing crimes because they are less apt to testify against each other. Heredia stated the fact that

3  Petitioner and Avila committed the shooting together was strong evidence that they were operating

4  in furtherance of the criminal gang.

5     In Heredia's opinion, Petitioner and Avila committed the shooting against Delaney in

6  furtherance or the criminal street gang of the Eastside Crips. Petitioner and Avila retaliated against

7  Delaney for the shooting of Avila's car by members of the Westside Crips. According to Heredia,

8  gang members will retaliate at the same level of violence or greater. Hypothetically, shooting at a

9  respected "OG" gang member's car would not go unpunished. In addition, if one gang member is

10 attacked or insulted, all other gang members take it personally as an offense against the gang itself.

11 Heredia also acknowledged that the motivation for the crime was partly personal; however, this did

12 not alter his opinion that the retaliation was ultimately in furtherance of the criminal street gang.

13    In his traverse, Petitioner presents a new claim. Rather than arguing the sufficiency of the

14 evidence, Petitioner takes a new tack by arguing that the expert witness testimony of Officer Heredia

15 was inadmissible under Federal Rules of Evidence and Ninth Circuit precedent. To the extent

16 Petitioner attempts to raise a new claim in the traverse, the Court will not review it on the merits.

17 See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir.1994) (noting that a district court need not

18 consider claims raised for the first time in a traverse). In addition, the Federal Rules of Evidence do

19 not govern in a state criminal trial, and Ninth Circuit decisions are not precedential authority in

20 determining whether the state court committed constitutional error meriting habeas relief. Petitioner

21 must demonstrate that the state court decision was contrary to or an unreasonable application of

22 clearly established Federal law, *as determined by the Supreme Court of the United States*. See 28

23 U.S.C. § 2254(d). Finally, this new claim is unexhausted, because Petitioner has failed to present it

24 to the California Supreme Court. See 28 U.S.C. § 2254(b)(1).

25    In sum, there was substantial evidence from which the jury could have found beyond a

26 reasonable doubt that Petitioner and Avila committed the crime with the specific intent to promote,

27 further, or assist the criminal conduct of the Eastside Crips. Thus, Petitioner has failed to

28 demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application

1   of, clearly established Federal law, as determined by the Supreme Court of the United States, or a

2   decision that was based on an unreasonable determination of the facts in light of the evidence

3   presented. See 28 U.S.C. § 2254(d). The claim must be rejected.

4   **B.  Ground Two**

5   In his second ground for relief, Petitioner claims the instruction, CALJIC 17.41.1[2], violated

6   the defendant's right to an independent and impartial jury in violation of the Sixth Amendment by

7   interfering with jury deliberations.

8   To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

9   ailing instruction by itself so infected the entire trial that the resulting conviction violates due

10  process. Estelle v. McGuire, 502 U.S. 62, 72 (1991). Additionally, the instruction may not be judged

11  in artificial isolation, but must be considered in the context of the instructions as a whole and the

12  trial record. Id. The court must evaluate jury instructions in the context of the overall charge to the

13  jury as a component of the entire trial process. See, United States v. Frady, 456 U.S. 152, 169

14  (1982), citing Henderson v. Kibbe,  431 U.S. 145, 154 (1977).  Furthermore, even if it is determined

15  that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if

16  the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in

17  actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (whether the error had a

18  substantial and injurious effect or influence in determining the jury's verdict.); see also Hanna v.

19  Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).

20  In this case, there is nothing in the record which supports Petitioner's allegation. There was

21  no report of a juror refusing to deliberate or disregarding the law. There was no jury deadlock and no

22  holdout juror. In short, there is no reason to believe the court's use of CALJIC 17.41.1 played any

23  role in the jury's deliberations. There is no evidence that deliberations were improperly chilled, that

24  majority jurors improperly imposed their will on the minority, or that Petitioner was denied his right

25

26  [2]CALJIC 17.41.1, as given by the trial court, provides:
        The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as
27  required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an
    intention to disregard the law or to decide the case based on penalty or punishment, or any other improper basis, it
28  is the obligation of the other jurors to immediately advise the Court of the situation.

1  to a unanimous jury and fair trial. Therefore, Petitioner has failed to demonstrate any prejudice

2  resulting from this instruction.

3       Moreover, Petitioner has failed to establish a federal constitutional violation.  The Supreme

4  Court has not held this instruction to be unconstitutional, and Petitioner does not point to any

5  Supreme Court authority which would bar the giving of this instruction.  The claim is foreclosed by

6  Brewer v. Hall, 378 F.3d 952, 957 (9th Cir.2004), which affirmed a district court's denial of the same

7  claim because there is no clearly established federal law holding that CALJIC 17.41.1 violates an

8  existing constitutional right.

9       Accordingly, the rejection of this claim by the state courts was neither contrary to or an

10  unreasonable application of clearly established Federal law, nor an unreasonable determination of the

11  facts in light of the evidence presented, and so it must be denied. See 28 U.S.C. § 2254(d).

12  **C. Ground Three**

13       In his third ground for relief, Petitioner contends the trial court excluded evidence of third

14  party culpability in violation of his Fourteenth Amendment due process rights. Specifically, he

15  claims that there were other males at the barbeque who matched Petitioner's description and had

16  access to the vehicle; however, the trial court excluded this evidence under Cal. Evidence Code

17  § 352.

18       The 5th DCA summarized the factual background as follows:

19       Shaquita Ballard testified a lot of people came and went from her apartment on the
20  day of the barbeque, including some she had never met before. She recalled there were about
     five men she knew, and two or three others she did not. On cross-examination, the defense
     asked Ballard if any of these men was wearing their hair in braids that day. The prosecutor
21  objected, whereupon the court held a hearing outside the presence of the jury to determine
     whether Ballard should be permitted to answer the question. The defense made an offer of
22  proof that Ballard would testify two of the men wore braids, and argued the testimony was
     relevant to show one of them may have been the shooter. The court ruled the testimony was
23  not admissible.

24       THE COURT: I have considered the offers of proof, [and] the arguments of
     counsel. And under all the circumstances, exercising my discretion, under [Evidence
25  Code section] 352, I do find that the probative value of this evidence that's been
     proffered by the defense is substantially outweighed by the risk of prejudice or
26  confusion. And I do find that his would be merely evidence of opportunity to commit
     the crime. And unless there's an offer of proof that she saw someone with this type of
27  hairstyle actually get in the suspect car and leave the scene, that would be the kind of
     evidence that would then arise to the level that I would reconsider this ruling. But
28  based on the offer of proof, I find under 352 that it would not be admissible. That's

1    my ruling.

2    See pp. 8-9, Exhibit 3, Answer.

3    In rejecting the claim, the 5th DCA stated:

4        Evidence offered to show a third person committed the offense with which the
         defendant is charged, to be admissible, need only be capable of raising a reasonable doubt
5        about the defendant's guilt. However, this rule does not require the indiscriminate admission
         of any evidence of third-party culpability.

6
         The evidence must meet minimum standards of relevance: 'evidence of mere
7        motive or opportunity to commit the crime in another person, without more, will not
         suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or
8        circumstantial evidence linking the third person to the actual perpetration of the
         crime.'
9
         Moreover such evidence still may be excluded under Evidence Code section 352.
10
         Gupton's reasoning, essentially, in support of admitting Ballard's testimony is this:
11       (1) the shooter probably left the barbeque in the Solara; (2) the shooter may have had braided
         hair; (3) two men at the barbeque had braided hair; (4) because they were at the barbeque, the
12       two men probably were associated with the Eastside Crips; and (5) as Eastside Crips, both
         men had the same motive as Gupton to shoot a Westside Crip.
13
         We find this reasoning rather strained, especially the speculation in the fourth step
14       that all the men at Ballard's barbeque were Eastside Crips. Even if we were to accept this
         hypothesis, however, it suggests nothing more than that others at Ballard's apartment that
15       day, in addition to Gupton, might have had the motive and/or opportunity to take part in the
         shooting. There was no offer of proof linking any of these other people to the actual crime.
16       There was such evidence, on the other hand, implicating Gupton. In addition to Carter,
         Kieisha Steverson (Delaney's ex-girlfriend), who had known Gupton since junior high school
17       six or more years earlier, positively identified him as the shooter.

18       We agree with the trial court that Ballard's proposed testimony was not sufficient to
         raise a reasonable doubt as to Gupton's guilt under the standard enunciated in People v. Hall,
19       supra, 41 Cal.3d 826. Accordingly, we find no abuse of discretion.

20   See pp. 9-10, Exhibit 3, Answer (citations omitted.)

21   Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a

22   federal habeas corpus proceeding. Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated

23   many times that 'federal habeas corpus relief does not lie for errors of state law.' "), quoting Lewis v.

24   Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J.,

25   concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation,

26   may not be corrected on federal habeas"); Tinsley v. Borg, 895 F.2d 520, 530 (9th Cir.1990), cert.

27   denied, 498 U.S. 1091 (1991) ("incorrect" evidentiary rulings are not the basis for federal habeas

28   relief); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), cert. denied, 478 U.S. 1021 (1985).

1   "Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal

2   constitutional rights are affected." Bockting v. Bayer, 399 F.3d 1010, 1038 (9th Cir. 2005), *citing*

3   Whelchel v. Washington, 232 F.3d 1197, 1211 (9th Cir. 2000).

4         Under California law, a defendant has the right to present evidence of third party culpability

5   if it is capable of raising a reasonable doubt about his own guilt. See People v. Hall, 41 Cal.3d 826,

6   833, 226 Cal.Rptr. 112, 116, 718 P.2d 99 (1986). In order for evidence of another suspect to be

7   admissible, however, there must be direct or circumstantial evidence linking the third person to the

8   actual perpetration of the crime. Id. Motive or opportunity is not enough. Id.

9         Petitioner does not cite to any Supreme Court authority which would require the admission of

10   such speculative evidence of third party culpability. In addition, the state court's decision was not

11   unreasonable, and the alleged error certainly does not rise to the level of a constitutional violation.

12   As discussed by the appellate court, there was no direct or circumstantial evidence linking these

13   unnamed men to the actual crime. Ballard's testimony only went so far as to demonstrate opportunity

14   and possible motive. Under California law, this is insufficient. In addition, the slight probative value

15   of this evidence was substantially outweighed by the risk of confusing the jury. Ballard's testimony

16   would only have gone so far as to establish that there were two unnamed males who also had braided

17   hair and who attended the barbeque. These unnamed men had no connection to the crime other than

18   having attended the barbeque and having had the opportunity to access the subject vehicle. On the

19   other hand, there was overwhelming evidence in the form of eyewitness testimony from witnesses,

20   including one who had known Petitioner since junior high school, that Petitioner was the actual

21   shooter. Therefore, even if the evidence would have been admitted, the outcome of the trial would

22   not have been different.

23         The state court rejection of this claim was neither contrary to or an unreasonable application

24   of clearly established Federal law, nor an unreasonable determination of the facts in light of the

25   evidence presented. See 28 U.S.C. § 2254(d). It must be denied.

26   ///

27   ///

28   ///

1

**ORDER**

2

Accordingly, IT IS HEREBY ORDERED:

3

1) The Petition for Writ of Habeas Corpus is DENIED with prejudice; and

4

2) The Clerk of Court is DIRECTED to enter judgment for Respondent.

5

IT IS SO ORDERED.

6

**Dated:     July 24, 2006**                              **/s/ Lawrence J. O'Neill**
b9ed48                                    UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28